UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------X
PRIDE TECHNOLOGIES, LLC d/b/a PRIDE ONE,

                        Plaintiff,                    Case No. 1:19-cv-11315 (LGS)

        -against-

DANIEL KHUBLALL,

                       Defendant.
--------------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S SUMMARY JUDGMENT MOTION

David B. Wechsler, Esq.
Mitchell S. Cohen, Esq.
Debora A. Pitman, Esq.
Daniel B. Grossman, Esq.
WECHSLER & COHEN, LLP
*Attorneys for Defendant*
17 State Street, 7th Floor
New York, New York 10004
(212) 847-7900
dwechsler@wechco.com
mcohen@wechco.com
dpitman@wechco.com
dgrossman@wechco.com

Jonathan Harris, Esq.
HARRIS ST. LAURENT LLP
*Attorneys for Defendant*
40 Wall Street, 53rd Floor
New York, New York 10005
(646) 395-3481
jon@hs-law.com

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

FACTS .................................................................................................................................3

    A.    Thomson's Acquisitions, Transformation Strategy, and Khublall's Reporting Lines.........3

    B.    Khublall and Thomson's Investigation of the Direct Sourcing Strategy ............................5

    C.    Thomson's Invitation to Pride to Participate in Direct Sourcing .........................................7

    D.    Pride's Complaints to Thomson and Thomson's Decision to Proceed with Direct Sourcing ..................................................................................................................................9

    E.    Thomson's Investigation of Pride's Complaints .................................................................11

    F.    Pride's Refusal to Work with TalentNet ............................................................................15

    G.    Thomson's Direct Sourcing Success and Praise for Khublall ...........................................15

    H.    Pride Has Spoliated Evidence It Cited When Accusing Khublall .....................................17

ARGUMENT .....................................................................................................................17

    I.    Summary Judgment Standard ...........................................................................................17

    II.    Pride's Tortious Interference with Business Relations Claim Should Be Dismissed........18

        A.    Thomson Is Not a Third Party Distinct from Khublall .............................................19

        B.    Khublall Did Not Act For the *Sole* Purpose of Harming Pride................................21

        C.    Khublall's Alleged Breach of Fiduciary Duty to Thomson Cannot Form the Basis for a Tortious Interference Claim .............................................................................22

        D.    Khublall Did Not Breach a Fiduciary Duty to Thomson..........................................24

        E.    Khublall's Actions Were Not the Proximate Cause of Any Injury to Pride's Business Relationship with Thomson.......................................................................24

    III.    Pride's Claim for Punitive Damages Should Be Dismissed .............................................25

CONCLUSION...................................................................................................................25

# **TABLE OF AUTHORITIES**

## **CASES**

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247 (2d Cir. 2015)...................................................18, 21

*American Baptist Churches v. Galloway*, 271 A.D.2d 92 (1st Dep't 2000)..................................23

*Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp.2d 200 (S.D.N.Y. 2005) ..........................23

*Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*, 158 A.D.2d 132 (3d Dep't 1990) ......20

*Carvel v. Noonan*, 3 N.Y.3d 182 (2004)................................................................................. 20-21

*Castellotti v. Free*, 138 A.D.3d 198 (1st Dep't 2016) .................................................................23

*Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008).........................24

*Devash LLC v. German Am. Capital Corp.*, 104 A.D.3d 71 (1st Dep't 2013).............................19

*Don Buchwald & Assocs. v. Marber-Rich*, 11 A.D.3d 277 (1st Dep't 2004)...............................23

*Etkin & Co. v. Patrusky*, 235 A.D.2d 300 (1st Dep't 1997) ........................................................23

*Fitzpatrick House III, LLC v Neighborhood Youth and Family Servs.*,
      55 A.D.3d 664 (2d Dep't 2008) ........................................................................................24

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)............................................19

*Gun Hill Rd. Serv. Station v. ExxonMobil Oil Corp*, 08 Civ. 7956 (PKC), 2013 WL 395096
      (S.D.N.Y. Feb. 1, 2013) ....................................................................................................20

*Havana Cent. NY2 LLC v. Lunney's Pub, Inc.*, 49 A.D.3d 70 (1st Dep't 2007) ..........................20

*House of Materials v. Simplicity Patterns Co.*, 298 F.2d 867 (2d Cir. 1962)...............................22

*Kruglove v. Copart of Conn., Inc.*, 771 Fed Appx. 117 (2d Cir. 2019)........................................25

*Marmelstein v. Kelhillat New Hempstead: Rav Aron Jofen Community Synagogue*,
      45 A.D.3d 33 (1st Dep't 2007) .........................................................................................23

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)...................................17

*NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614 (1996) ......................................18

*New York Univ. v. Cont'l Ins. Co.*, 8 N.Y.3d 308 (1995)............................................................25

*Nu-Life Constr. Corp. v. Bd. of Educ. of the City of New York*,
204 A.D.2d 106 (1st Dep't 1994) ...................................................................20

*Petkanas v. Kooyman*, 303 A.D.2d 303 (1st Dep't 2003).................................... 19-20

*Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009) ..........................21

*Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216 (2d Cir. 2017) .............................25

*RXR WWP Owner LLC v. WWP Sponsor, LLC*, 132 A.D.3d 467 (1st Dep't 2015).....................20

*Seretis v. Fashion Vault Corp.*, 110 A.D.3d 547 (1st Dep't 2013).................................23

*Snyder v. Sony Music Entm't, Inc.*, 252 A.D.2d 294 (1st Dep't 1999) ..........................22

*State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158 (2d Cir. 2004).......24

*Stortini v. Pollis*, 138 A.D.3d 977 (2d Dep't 2016) ...................................................24

*Swabath Info Servs. Co. v. Eagle*, 598 Fed. Appx. 794 (2d Cir. 2015) ...........................24

*Turner Constr. Co. v. Seaboard Surety Co.*, 98 A.D.2d 88 (1st Dep't 1983)........................ 21-22

*Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt, L.L.C.*,
455 Fed. Appx. 102 (2d Cir. 2012).................................................................24

*White Plains Coat & Apron Co., v. Cintas Corp.*, 8 N.Y.3d 422 (2007)......................................18

## **STATUTES AND OTHER AUTHORITIES**

Fed. R. Civ. P. 56(c) ...................................................................................17

Daniel Khublall ("Khublall") respectfully submits this memorandum of law in support of his motion for summary judgment dismissing with prejudice the First Amended Complaint ("FAC") by plaintiff Pride Technologies, LLC d/b/a Pride One ("Pride" or "Pride One") for "Tortious Interference with Business Relations."

## PRELIMINARY STATEMENT

If Pride's suit is allowed to stand until trial, every employee dealing with an employer's vendors will be at risk of ruin by litigation whenever the employer makes a lawful business decision that adversely impacts the vendors' revenues, even if the loss is derivative and not based on a contract. Pride's vendor "relationship" to non-party Thomson Reuters Corporation and its affiliates (including Thomson Reuters Holdings Inc., collectively, "Thomson") was not contractual. Thomson did not breach any duty (tort or otherwise) to Pride. Thomson never paid Pride. Instead, Thomson ended a contractual relationship with Pontoon Solutions, Inc. ("Pontoon"), a "managed service provider" ("MSP"). In turn, that decreased Pride's derivative revenue from Pontoon.

Thomson employed Khublall from 2014 until the end of 2018. Khublall had many levels of bosses, limited authority, and limited responsibility. During Khublall's tenure, Thomson focused on a business transformation. Thomson's most senior management spotlighted contingent labor, *i.e.*, individuals providing services to Thomson but employed by others, for a dramatic change. The documentary record establishes that Thomson imposed tasks on Khublall, he fulfilled those tasks, and Thomson made its business decision to change its contingent labor business practices to include "direct sourcing" and new technology. Then and in hindsight, and knowing Pride's allegations, Thomson believes that it made the right decision for Thomson.

Nevertheless, Pride sues Khublall for $10 million plus punitive damages. Pride knows it could never recover any such sum from Khublall (claiming Khublall sought future employment

with Pride at $250,000 per year) (Dkt. No. 21, ¶ 16), similar to Khublall's final Thomson compensation. Pride does not attempt to reach Thomson's pocket. Pride's goal is to destroy Khublall, both his reputation and financially, by baseless litigation.

Pride's claim rests upon at least two lies.  As a matter of law, these lies do not create a material fact issue. Instead, giving Pride every inference and benefit of its allegations, the evidence establishes that Pride's claim for tortious interference with a business relationship (but not contract) fails. There are years of emails documenting and an internal Thomson investigation confirming that Khublall performed his assigned tasks under Thomson's mandate, supervision, approval, and repeated ratification (ongoing to the present). Khublall's motivation cannot be "solely" to harm Pride, as alleged and as required for Pride's claim to warrant a trial, because Khublall did his job. Thomson, not Khublall, decided on the direct sourcing business transformation strategy and Thomson, not Khublall, decided how to implement its strategy using technology that TalentNet Inc. ("TalentNet") offered.

As Pride had an indirect "business relationship" with Thomson, Pride cannot assert a tortious interference claim against Thomson. A party cannot tortuously interfere with its own business relationship. For the same reason, Thomson's decision cannot itself be or reflect Khublall's alleged "wrongful means," including retaliation, against Pride. As Thomson required, authorized, applauded, and ratified Khublall's actions, there can be no cause of action against Khublall, Thompson's employee.

As to Pride's alternative theory about a tort based on a fiduciary duty, Khublall did not owe Pride a fiduciary duty; even Pride does not allege that. Although Khublall met all his obligations, fiduciary and otherwise, to Thomson, even if he had not, that would not legally suffice for Pride to have a tortious interference claim against Khublall. A breach of fiduciary

duty can only sustain a tortious interference claim if the defendant owed the fiduciary duty to the plaintiff.

There is another dispositive ground: Khublall's actions were not the proximate ("but for") cause of any claimed injury to Pride. Thomson (not Khublall) made the decision how to implement Thomson's transformation strategy. Persuasion alone cannot sustain a tortious interference claim. In addition, Thomson affirmed its decision after investigating Pride's complaints. Thus, Thomson broke the causal chain between Khublall's communications to Thomson colleagues and Pride's alleged injury. Further, although Pride's FAC alleges that "Thomson could have simply maintained its relationship with Pride One through the new MSP [Pontoon's replacement] that was selected as the intermediary between Thomson and the Payroll Services provider," Pride refused to work with the new vendor selected by Thomson despite being given many opportunities. From the outset and through when Pride first threatened to sue (years before bringing suit), Pride viewed TalentNet as competition. Pride documented this internally and wrote to Thomson that it would not work with TalentNet. Pride chose not to do business with Thomson. None of the foregoing can be, credibly, contested.

## FACTS[1]

**A.** **Thomson's Acquisitions, Transformation Strategy, and Khublall's Reporting Lines**

Between 2011 and 2013, Thomson acquired nearly 100 companies at an aggregate cost of $3.8 billion.[2] Beginning in 2014, Thomson undertook to transform itself into an integrated enterprise.[3] Thomson retained McKinsey & Company ("McKinsey") to identify potential areas

---

[1] These facts are based upon affidavits and declarations, business records, and Pride's admissions. Specific citations are provided. All declarants and affiants have been identified in automatic disclosures. Exhibits referenced herein are annexed to the November 6, 2020 Declaration of Debora A. Pitman unless otherwise noted.
[2] Declaration of Thomson's Neil Masterson ("Masterson Dec.") ¶ 6; Ex. A to the Declaration of Thomson's Steven Moll ("Moll Dec."), Excerpts from Thomson's 2017 Annual Report.
[3] Masterson Dec. ¶¶ 4-10; Ex. B to the Moll Dec., Excerpts from Thomson's 2015 Annual Report.

where greater efficiency could be achieved.[4] McKinsey identified Thomson's contingent labor practices.[5] Thomson's senior management, by its then Chief Operating Officer, Neil Masterson ("Masterson"), required an analysis and directed that alternatives be investigated.[6] In 2016, Thomson created an Enterprise Technology & Operations ("ET&O") group, under Masterson as Vice President and Chief Transformation Officer, to drive transformation, centralize operations, and unify functions into a single team including technology platforms, operations and data centers, and others including "sourcing," *i.e.*, identifying temporary personnel.[7]

Thomson's Rick King ("King"), Managing Director, reported to Masterson.[8] In about 2016, King's role included supervision of Thomson's sourcing department.[9] King attests that "Khublall was three reporting lines below [King]."[10] In 2016, Carl Tobiasen ("Tobiasen"), Senior Vice President, Global Head of Sourcing (now retired), reported to King.[11] Nicolas Passaquin ("Passaquin"), Vice President Global Head of Sourcing, reported to Tobiasen.[12] At first, Khublall reported to Brad Blonkvist who left Thomson, and then to John DeMattia ("DeMattia"), who reported to Tobiasen.[13] When DeMattia departed Thomson in December 2016, Khublall reported to Passaquin.[14]

---

[4] Masterson Dec. ¶ 5; Declaration of Thomson's Nicolas Passaquin ("Passaquin Dec.") ¶ 2.
[5] Masterson Dec. ¶ 5; Declaration of Thomson's Carl Tobiasen ("Tobiasen Dec.") ¶ 3; Declaration of Thomson's Richard King ("King Dec.") ¶ 5.
[6] King Dec. ¶ 5; Passaquin Dec. ¶¶ 1-2; Tobiasen Dec. ¶ 3.
[7] Masterson Dec. ¶ 7; King Dec. ¶ 3, 5.
[8] King Dec. ¶ 3.
[9] *Id.* at ¶ 2.
[10] *Id.* at ¶ 3.
[11] *Id.*
[12] *Id.*
[13] *Id.*; Tobiasen Dec. ¶ 2.
[14] *Id.*

**B.      Khublall and Thomson's Investigation of the Direct Sourcing Strategy**

Tobiasen attests to Thomson's goal: "determine where key saving can be achieved by improving efficiencies, re-negotiating current contracts and implementing new technologies."[15] Tobiasen explains:

> Khublall began evaluating the viability of a direct sourcing strategy for its contingent labor services to save costs, increase hiring and placement efficiency, and innovate into the future of the contingent labor industry. Thomson's transition to direct souring was not a simple change of a vendor. Thomson sought and transformed and changed its contingent labor practices to save money.[16]

In April 2016, Thomson launched a direct sourcing pilot program to identify contingent labor personnel for Thomson temporary employment opportunities.[17] In a May 10, 2016 Project Management Statement concerning contingent labor, Tobiasen identified Khublall as "Project Lead" and "Project Owner" and DeMattia as "Project Sponsor."[18] Passaquin attests to his authority being limited to authorizing Khublall's implementation of only the pilot program.[19]

In a May 24, 2016 email, Khublall introduced TalentNet to Pride's founder and chief executive officer, Leo Russell ("Russell"), and his senior colleague, Kate Goss ("Goss").[20] On June 1, 2016, TalentNet met with Pride in person.[21] Russell and Goss exchanged emails agreeing that the "TalentNet guy didn't sit well with [them] at all" and Russell expressed concern that TalentNet posed a threat.[22] Russell wrote Goss that he had asked TalentNet seven times to

---

[15] Tobiasen Dec. ¶ 6.
[16] Tobiasen Dec. ¶ 5; *see also*, Passaquin Dec. ¶ 6; King Dec. ¶ 6; Declaration of Thomson's Wendy Stenger ("Stenger Dec.") ¶ 7.
[17] Passaquin Dec. ¶ 7.
[18] Tobiasen Dec. ¶ 6; Ex. 1, May 10, 2016 Project Management Statement.
[19] Passaquin Dec. ¶ 7.
[20] Ex. 2, May 24, 2016 email from Khublall to Russell *et al.*
[21] Ex. 3, June 1-4, 2016 email chain at 6:17 p.m.
[22] Ex. 3, June 1-4, 2016 email chain at 11:05 p.m.

confirm that it could fill 83% of Thomson's contingent personnel requisitions and Russell questioned what would be left for Pride.[23]

Tobiasen states that "at the end of 2016, Passaquin informed [him] that a direct source pilot model was in place in the United States" and "was generating a lower fee and providing better access to the worker pool."[24] In a February 14, 2017 email, Tobiasen wrote Khublall: "Can we get your direct source model plan put together for review. I'd like to get this up the line."[25] In a February 25, 2017 email, Tobiasen asked King to meet with Khublall and others.[26]

King gave direct sourcing a "green light" explaining he "love[d] what [Khublall] is working on."[27] King also met with TalentNet personally to evaluate its tool for the Thomson direct sourcing strategy.[28] Thomson encouraged Khublall to share the proposal with others including Thomson's Mark Sandham ("Sandham"), Senior Vice President and Chief Operating Officer, HR, who too was very enthusiastic.[29] King attests that consistent with Thomson's culture, Khublall "socialized" the direct sourcing proposal to many:

> Khublall also had to "socialize" the direct sourcing proposal because Khublall had no authority to implement it without support and approval. Khublall needed approval from [Thomson's] Finance, Sourcing, Legal, and HR departments and, in any event, did not have the authority to sign this contract for [Thomson] or terminate an agreement or terminate a [Thomson] business relationship. Tobiasen had authority to approve Khublall's proposal by Sourcing, and I would ensure that the necessary approvals from Finance and HR were obtained. In addition, Khublall did not have authority to terminate [Thomson's] supplier contracts, including [Thomson's] agreement with Pontoon, but needed senior management approval to take any such action, which he ultimately received.
>
> On February 28, 2017, I held a networking session that Khublall attended. Khublall met with me the next day to discuss the direct sourcing progress. In a

---

[23] Ex. 3, June 1-4, 2016 email chain at 6:17 p.m.
[24] Tobiasen Dec. ¶ 7.
[25] Passaquin Dec. ¶ 8; Ex. 4, February 14, 2017 email from Tobiasen to Khublall.
[26] Ex. 5, February 25, 2017 email chain including email from Tobiasen to King.
[27] King Dec. ¶ 9; Ex. 6, March 1, 2017 email at 14:42 from King to Tobiasen.
[28] King Dec. ¶ 9.
[29] King Dec. ¶ 6.

March 1, 2017 email, I wrote to Tobiasen "Love what he is working on. Green light." Khublall did not have the authority to proceed independently.

TR's Finance, Sourcing, and HR departments independently approved Khublall's direct sourcing proposal.[30]

Tobiasen reiterates that Khublall needed approval from Thomson's Finance, Sourcing, Legal, and HR departments and that Khublall did not have independent authority to end a Thomson business relationship.[31] Further, while Tobiasen had authority to approve Khublall's proposal on the Sourcing department's behalf, King had to ensure necessary approvals from Finance and HR.[32] Khublall did not have authority to terminate Thomson's agreement with Pontoon.[33] King had that authority.[34] After Passaquin and Tobiasen met with Khublall, Tobiasen "confirmed Khublall's being directed and authorized to implement a new direct sourcing business practice" implementing TalentNet.[35]

C.   **Thomson's Invitation to Pride to Participate in Direct Sourcing**

On June 2, 2017, Khublall on behalf of Thomson wrote to Pride and others stating, as pertinent:

A year ago Thomson Reuters began evaluating the viability of a direct source strategy within its contingent workforce program.

To date, because of the initial focus on evaluation, we have not made any significant changes to our MSP / Payroll / or underlying technology in the program. We have kept each in silos and piloted the concept of direct source in parallel to understand if it was a viable strategy for us.

Based on the current results we see viability in direct source, but feel it could be further enhanced by transformation within our MSP, VMS, and Payroll programs and we are looking to our partners to provide innovative and creative ideas on how to further success the evolution of our program.

---

[30] King Dec. ¶¶ 7-10; *see also*, Tobiasen Dec. ¶ 8; Stenger Dec. ¶ 10.
[31] Tobiasen Dec. ¶ 10; *see also*, King Dec. ¶¶ 8-9; Passaquin Dec. ¶ 7; Stenger Dec. ¶ 10.
[32] Tobiasen Dec. ¶ 10; King Dec. ¶ 8.
[33] Tobiasen Dec. ¶ 10; King Dec. ¶ 8; Passaquin Dec. ¶ 5.
[34] Tobiasen Dec. ¶ 10.
[35] Tobiasen Dec. ¶ 11.

Further regarding our direct source initiative we are ultimately pursuing a holistic and total talent solution. We are looking to implement a model that can lay the foundation for a combined strategy between temporary workers, SOW workers, and eventually our full time population of workers.

This is not going to be a formal RFP or RFI, this is only going out to a selected number of incumbent partners of Thomson Reuters to understand how you can support our program transformation initiatives.

I personally believe we are on the cusp of achieving total talent management and am looking for material solutions on how we can transform our current model to position ourselves to make total talent management reachable.

I will come to you next week with the questions regarding this initiative, please confirm receipt and intent to respond via this email.[36]

Khublall followed up on June 7, 2017, and provided a "worksheet for this transformation exercise," calling for submissions by June 23, 2017.[37] Pride made a proposal to provide payroll services but nothing else.[38] On June 24, 2017, Khublall wrote Pride:

I've read through your response and am not sure what you have proposed. I'm looking for creative solutions that show how to manage the overall program. There's nothing in your response on non-referred (non-payroll) PMO the backoffice admin/SOW management. Payroll was one of 4 sections.[39]

Internally, at the end of June and into the first week of July, Pride considered whether to "join forces" with a company that had technology to compete with TalentNet. In a June 28, 2017 email, Pride's Jay Philip ("Philip") wrote to Russell and Goss:

WorkMarket will private label their technology to us tomorrow if we want to join forces with them to lob in a bid.

Their technology is the real deal and they are well known in the FMS universe, **I'm fairly confident that they can do what TalentNet does – only better**.[40]

Russell responded to Philip "[n]ot urgent at all." [41] Pride did not make a proposal to Thomson incorporating WorkMarket's technology.

---

[36] Ex. 7, June 2, 2017 email from Khublall to Pride *et al*.
[37] Ex. 8, June 7, 2017 email from Khublall to Pride *et al.* without attachment.
[38] Ex. 9, Pride's Proposal: Transformation of Payroll Services at Thomson Reuters.
[39] Ex. 10, June 24, 2017 email chain among Khublall, Goss, and Russell.
[40] Ex. 11, April 25-June 29, 2017 email chain between WorkMarket and Pride (emphasis added).

**D.      Pride's Complaints to Thomson and**
**        Thomson's Decision to Proceed with Direct Sourcing**

In the last week of June 2017, Pride's Russell spoke and met with Khublall.[42]   On June 30, 2017, Khublall wrote Passaquin that Pride (and specifically Russell) "is resorting to threatening me" and stating "I am going to suspend any decisions on the program until we can speak."[43] Dissatisfied and fearing Thomson's transformative plan, also on June 30, 2017, Russell emailed Thomson (copying Pontoon) to discuss:

> on a confidential basis, a course of behavior by Mr. Khublall which is deeply troubling to me and, in my view, clearly violative [sic] of basic corporate norms as well as Thomson Reuters' code of conduct and ethical standards. [44]

On July 6, 2017, Passaquin spoke with Russell about Khublall.[45] Passaquin reported to Tobiasen:

> I had a call with the guy [*i.e.*, Russell] and will have one with the Pontoon lady [Pontoon's Thomson account manager Linda Iametti ("Iametti")] before making up my mind what to do next.
>
> I am skeptical around what this is all about. [Russell] thinks that Dan is crossing the line with regards to promoting the TalentNet solution and that he might have a personal interest to do so.   I'll keep investigating but so far I am tempted to believe that Dan did nothing wrong.[46]

Also on July 6, 2017, Passaquin emailed DeMattia, then a former Thomson employee and Khublall's former manager.[47] DeMattia knew both Russell and Khublall.[48] By email, DeMattia informed Passaquin that he had spoken with both Russell and Khublall within the last two days and invited Passaquin to call.[49] As Passaquin memorialized in an email to Tobiasen concerning this conversation, DeMattia "believe[s] there is nothing wrong with the relationship with

---

[41] *Id.*
[42] Passaquin Dec. ¶ 12; Ex. 12, June 29, 2017 email informing Khublall of Russell's visit.
[43] Ex. 13, June 30, 2017 email from Khublall to Passaquin.
[44] Passaquin Dec. ¶ 13; Ex. 14, June 30, 2017 email from Russell to Thompson.
[45] Passaquin Dec. ¶ 14.
[46] Passaquin Dec. ¶ 15; Ex. 15, July 6, 2017 email at 15:03 from Passaquin to Tobiasen.
[47] Passaquin Dec. ¶ 16; Ex. 15, July 6, 2017 email at 9:09 a.m. from Passaquin to DeMattia.
[48] *Id.*
[49] *Id.*; Ex. 15, July 6, 2017 email at 15:20:58 from DeMattia to Passaquin.

TalentNet and the main issue is Pride being upset [about] losing [TR's] business without having a fair chance to compete."[50]

In a July 7, 2017 email, Passaquin informed Thomson's Lisa Moyer ("Moyer"), Head of Talent Acquisition, Financial & Risk, Reuters and Corporate, that he had spoken with:

> Pride, Pontoon and John DeMattia (Dan's previous boss and our ex global head of sourcing). Unless, something new shows up, I believe that Pride['s] CEO is upset as he will potentially lose the business to a new entrant competitor.[51]

Moyer responded by email stating:

> [Khublall] and I had another chat this week and I had him go through again in depth with me about the RFPs, talent Net [sic] and Pride's reaction.  After hearing it again, I think I would concur the same . . . [Russell] is highly concerned about losing [Thomson's] business and his view is he didn't get a fair shake to make his case (not sure that['s] an accurate assessment either.)[52]

In a July 7, 2017 email, Passaquin informed Khublall that he had spoken with Russell and Iametti concerning Pride's concerns.[53] Passaquin wrote Khublall confirming Thomson's decision to proceed with implementing the direct sourcing model notwithstanding Pride's complaints:

> I can't see reasons to delay the announcement and the move from the current model we have with Pontoon to a TalentNet/Randstad solution. You can go ahead for this piece and we need to ensure that it is in place by end of August.[54]

On July 14, 2017, Passaquin wrote Khublall: "We should go ahead with a consistent global and scalable solution, Pride cannot offer that. So we are resolved."[55] On July 26, 2017, Russell wrote Passaquin (copying Pontoon) reiterating claimed "legal and ethical concerns."[56] Russell concluded by threatening to sue Khublall and Thomson for tortious interference with

---

[50] Passaquin Dec. ¶ 16; Ex. 15, July 6, 2017 email at 15:03 from Passaquin to Tobiasen.
[51] Passaquin Dec. ¶ 18; Ex. 15, July 7, 2017 email chain at 3:29 p.m. from Passaquin to Moyer.
[52] Passaquin Dec. ¶ 19; Ex. 15, July 7, 2017 email chain at 4:02 p.m. from Moyer to Passaquin.
[53] Passaquin Dec. ¶ 20.
[54] Passaquin Dec. ¶ 20; Ex. 16, July 7, 2017 email from Passaquin to Khublall.
[55] Ex. 17, July 14, 2017 email chain between Passaquin and Khublall.
[56] Passaquin Dec. ¶ 21; Ex. 18, July 26-27, 2017 email chain at 21:36 from Russell to Passaquin *et al.*

contract.[57] Passaquin reacted by writing Tobiasen bullet-points to reiterate that Thomson would

proceed with the direct sourcing model:

- Nothing more in his email than what he stated early July (and more importantly no proof just his words)
- Since then, I talked to [a] number of people internally and externally and found nothing wrong in Dan's behavior/approach
- Any procurement strategy in this area has been documented, presented and approved by our senior executives
- **We will go ahead with the plan as it gives scale, cost effectiveness and a consistent global model for TR**
- However I'll pass his comment to our internal audit team for them to take an independent view
- Meanwhile, the changes are going ahead as planned.[58]

Tobiasen responded to Passaquin: "Totally agree."[59] On July 27, 2017, Passaquin wrote Russell:

I am not sure there is anything new in what you wrote compared to the conversation we had early July. Following that conversation, I talked to multiple people internally and externally and did not find anything which would raise suspicion apart from your words below.

The procurement strategy that [Khublall] is implementing has been documented, presented, explained and approved by our senior executives. We will go ahead as planned as it gives scale, cost effectiveness and a consistent global model for Thomson Reuters.

However, I'll pass your comments to our internal audit team for them to conduct an independent investigation.[60]

### E.   Thomson's Investigation of Pride's Complaints

On July 27, 2017, Passaquin also forwarded Pride's July 26, 2017 email to Thomson's

Robert Goodall ("Goodall"), Thomson's Vice President of Enterprise Compliance, asking for

guidance concerning Pride's complaints against Khublall, writing:

We have a payroll supplier in the US (serving us since 2013) who will lose TR business as a result of a light RFP conducted in May/June by a sourcing individual called Dan Khublall. The CEO of that company sent an email to Carl

---

[57] *Id.*
[58] Ex. 18, July 26-27, 2017 email chain at 2:32 a.m. from Passaquin to Tobiasen (emphasis added).
[59] Ex. 18, July 26-27, 2017 email chain at 8:01 a.m. from Tobiasen to Passaquin.
[60] Passaquin Dec. ¶ 22; Ex. 19, July 27, 2017 email chain between Passaquin and Russell.

[Tobiasen] early July requesting a call.  I took on that call and he basically explained to me what he wrote below.

After the initial conversation, I reviewed the business case (which both Rick King and Carl [Tobiasen] approved), I talked to 2 Pontoon people and John DeMattia (Dan [Khublall's] previous boss and our ex head of global sourcing). I then exchanged with one key stakeholder Lisa Moyer (head of Talent Acquisition F&R, Reuters and Corporate) and cannot find anything which could lead me to believe that there is anything wrong with this. I am tempted to believe that Pride CEO [sic] is just upset as he will lose the business to a new entrant competitor.[61]

After receipt, Goodall submitted a "Request for Monitoring" to Thomson's IT Security requesting all of Khublall's Thomson emails.[62] To support this request, Goodall wrote:

The CEO and founder of Pride Global, a Thomson Reuters vendor, has alleged that Dan Khublall, Senior Director of Fieldglass Process and Contingent Labor Sourcing, made overtures to him to adopt the services of TalentNet, a third-party talent services company, and demanded that Pride introduce TalentNet to new clients, threatening to pull Pride's business with TR if they did not.[63]

Goodall attests to his investigation notes:[64]

There is no email evidence to suggest any plan from Mr. Khublall to [support Russell's claimed "gambit"]. Emails and discussions with Mr. Khublall and Nicolas Passaquin suggest the engagement of TalentNet was done with full transparency to Sourcing Senior Management (John DeMattia, Brad Blonkvist) and the project idea gained added momentum after a McKinsey study in November 2015 identified Thomson Reuters contingent labor practices as an opportunity for cost savings by cutting vendor margins and overall usage. From this point changing the approach to contingent labor became part of the Transformation strategy for the company. Mr. Khublall's emails demonstrate an ongoing and evolving approach to contingent labor with presentations to John DeMattia, Mark Sandham and Rick King from Q4 2015 through Q1 2016, during which Mr. Khublall was also openly working with Pontoon to engage and integrate TalentNet into the Thomson Reuters contingent labor process. Mr. Khublall's emails show that TalentNet was set up as a staffing supplier under Pontoon in January 2016. In February 2016, Pontoon management expressed concern on February 2 and February 17, 2016 that the Thomson Reuters direct sourcing strategy conflicted with Pontoon's organizational strategy and goals but the project pushed forward with Pontoon engaging TalentNet to create a direct source solution for contingent labor. Mr. Khublall stated that during a 1:1 catch

---

[61] Passaquin Dec. ¶ 23; Ex. 20, July 27, 2017 email chain including email from Passaquin to Goodall.
[62] Goodall Dec. ¶ 5; Ex. 21, Goodall's July 27, 2017 Request for Monitoring.
[63] *Id*.
[64] Ex. 22, Goodall's "Enterprise Compliance Investigation Draft Notes Regarding Pride Complaint."

up with John DeMattia on February 4, 2016, they agreed to continue to move forward with the strategy. By Q4 2106, the model is also being discussed in the UK between Experis and TalentNet. Mr. Khublall stated that by January 2017 there were demonstrated savings coming from the model, which he shared with Nicolas Passaquin, his new manager.[65]

On September 8, 2017, Goodall interviewed Russell by video teleconference.[66]  Goodall attests that he found Russell's allegations problematic because the alleged events occurred more than a year earlier and, under the Thomson "Supplier Chain Ethical Code" (and common sense), suppliers are required to notify Thomson of alleged employee misconduct immediately.[67] According to Goodall, Russell stated that he had recordings of Khublall made in Russell's office but declined to produce them.[68] This surprised Goodall.[69] (Pontoon memorialized having been informed about the supposed recordings too.)[70] Goodall attests that Russell did not explain why he delayed more than one year in raising Pride's allegations to Thomson.[71] Instead, he concentrated on trying to convince Goodall that Thomson's direct sourcing strategy would not work.[72]

On September 28, 2017, Goodall wrote Passaquin and Tobiasen:

Based on my review of all available information and separate discussions with John DeMattia and Mr. Russell, I do not believe there to be any merit to the claims outlined in Mr. Russell's July 26 email. Mr. Russell was not able to provide any information to support his claims and there was no information to be found to suggest that Dan Khublall had acted unethically in his interactions on behalf of Thomson Reuters with either Pride or Pontoon.[73]

---

[65] Goodall Dec. ¶ 6. (brackets in original)
[66] Goodall Dec. ¶ 14.
[67] *Id*.
[68] *Id*.
[69] *Id*.
[70] Ex. 23, June 30, 2017 email chain including internal Pontoon email.
[71] Goodall Dec. ¶ 15.
[72] *Id*.
[73] Goodall Dec. ¶ 19; Ex. 24, September 28, 2017 email from Goodall to Tobiasen and Passaquin.

Subsequently, in an October 12, 2017 Enterprise Compliance Investigation report (the

"ECIR"), Thomson exonerated Khublall:[74]

> Nicolas Passaquin, Mr. Khublall's manager, confirmed the Sourcing transformation strategy, and that Mr. Khublall presented the direct sourcing strategy plan involving TalentNet to senior leadership in January 2017 and that he was given approval to proceed in March 2017. Mr. Passaquin also stated that there were never any ethical concerns raised to him regarding Mr. Khublall.
>
> Discussions with John DeMattia, the prior Global Head of Thomson Reuters Sourcing, confirmed Mr. Khublall's version of events. **Mr. DeMattia stated that McKinsey had been engaged to study overall costs at Thomson Reuters and contingent labor was identified as a target for reduction. As a result, Mr. Khublall went to conferences and began working with TalentNet to develop a direct sourcing technology for Thomson Reuters.** According to Mr. DeMattia, Mr. Khublall's objective was to rationalize the contractor supply base and reduce overall contingent labor costs for Thomson Reuters, and that eventually Pontoon would be eliminated as a supplier for Thomson Reuters due to cost. Mr. DeMattia stated Mr. Khublall approached Mr. Russell early on with the concept, and Mr. Russell was resistant to developing this approach. As a result, Mr. DeMattia made Mr. Russell aware that Mr. Khublall would be moving forward with developing the concept with TalentNet. Mr. DeMattia made clear that at no time while he was at Thomson Reuters did Mr. Russell ever raise any ethical concerns to him about Mr. Khublall.
>
>         \*   \*   \*
>
> Enterprise Compliance's review of emails found both Pride and Pontoon were made aware of Thomson Reuters goals to reduce spend related to contingent labor. Internal emails and presentations also demonstrated Dan Khublall took efforts over an 18-month period to engage and align both Pontoon and Pride, the incumbent suppliers for contingent labor, with the Thomson Reuters transformation strategy, which included the Sourcing goal of reducing contingent labor costs. Discussions with Mr. Khublall also confirmed that he had met with and made Mr. Russell directly aware of the transformation strategy to reduce contingent labor costs. According to Mr. Khublall, Mr. Russell was very opposed to the plan and had resisted engaging with the owner TalentNet despite Mr. Khublall introducing the parties in an effort to discuss the Thomson Reuters transformation strategy.[75]
>
>         \*   \*   \*

In the ECIR, Goodall on behalf of Thomson concluded:

> Mr. Russell presented no information to support any of the allegations he raised concerning Mr. Khublall, including that Mr. Khublall had an undisclosed conflict of interest with TalentNet. Additionally, Mr. Khublall denied having an

---

[74] Goodall Dec ¶ 22 and Ex. A to the Goodall Dec., ECIR.

[75] *Id*. (emphasis added).

undisclosed conflict of interest with TalentNet and presented extensive internal documentation and emails supporting Sourcing's transformation strategy for reducing contingent labor costs. Mr. Russell's concerns appeared to be limited to his disagreement with the Thomson Reuters Sourcing decision to pursue a strategy that no longer included his company as the main supplier for contingent labor. Regardless of Mr. Russell's opinion on the viability of the strategy, the decision by Thomson Reuters management to engage TalentNet as part of the Sourcing transformation strategy is a business decision. Mr. Russell acknowledged making a recording of Mr. Khublall without his knowledge and suggested the recording would support his allegations against him. Mr. Russell declined to make the recording available to Thomson Reuters. A supplier making unsupported allegations and a surreptitious recording of a Thomson Reuters manager supervising that relationship would not be in keeping with accepted Thomson Reuters expectations and business practices for third-party suppliers.[76]

**F.**    **Pride's Refusal to Work with TalentNet**

In an October 3, 2017 email by Russell, Pride stated:

…we will entertain contracting with Pontoon (if TR negotiates an extension,[]) Randstad or Thomson Reuters directly. ***We are not interested in contracting with TalentNet or any competitive third party.***

Also, be informed that we enjoy a contractual relationship with each of our employees and contractors and any attempt to interfere with that contract by a third party will be considered tortious interference.  I don't suspect this is the plan, but I just want to be clear.[77]

**G.**    **Thomson's Direct Sourcing Success and Praise for Khublall[78]**

Wendy Stenger ("Stenger"), now Thomson's Global Head of External Workforce Programs, is a "Staffing Industry" professional. The Staffing Industry Association (the "SIA") named her to its 2019 Contingent Workforce Program Game Changers List. Industry publications describe her as: (a) a global leader in contingent workforce programs; and (b)

---

[76] *Id.* Pride's deposition questioning of Khublall suggests that Pride may attempt to change its theory of the case. Nevertheless, contrary to any new, baseless suggestion of Khublall wrongdoing, Goodall attests that he recalls Khublall and Passaquin disclosing that, consistent with permitted Thomson practice, Khublall's expenses to attend industry conferences were defrayed by conference sponsors including industry vendors. Goodall did not include this in the EICR or his notes deeming the information immaterial and the conduct permitted.  Goodall notes that Thomson too sometimes covers expenses for others when in Thomson's interests including travel expenses for judges and others, as may be allowed, that speak at legal conferences in which Thomson participates and/or sponsors. Goodall Dec. ¶ 21.

[77] Passaquin Dec. ¶ 25; Ex. 25, October 3, 2017 email from Russell to Passaquin (emphasis added).

[78] The facts in this section are drawn from the Stenger Dec. unless noted otherwise.

having been instrumental in developing a design that includes a technology-powered self-sourcing model to recruit contingent labor in the United States and elsewhere.

Stenger attests that during the first two quarters of 2017, Thomson discussed and considered direct sourcing, the concept was "socialized" within Thomson, and it became a topic of industry conversation. Stenger understood that Khublall did not have the authority to implement direct sourcing, nor to allow Thomson's agreement with Pontoon to expire. She reiterates that only Thomson's senior management had authority to make the direct sourcing decision.

Thomson's Stenger attests that Khublall did a "fantastic job" for Thomson by introducing the direct sourcing strategy. Stenger also attests that direct sourcing has allowed Thomson to capitalize on its own brand to attract job candidates. She explains that currently 80% of Thomson's contingent workers in the United States, Canada, and the United Kingdom are directly sourced. Thomson dramatically reduced the number of contingent worker suppliers from ninety-five when Stenger began to seventeen by 2018. She also attests that Thomson has decreased expenses for contingent labor markups including decreasing payroll expenses by $16.7 million (USD) as of the end of 2019.

Stenger further attests that the SIA published an article applauding Thomson's decision to transition to direct sourcing (*Contingent Labor: Overlooked Source of Diversity Spend?*, SIA May 10, 2019). Among other things, the article states: "The success of Thomson Reuters' Direct-Source program has enabled it to attract contingent labor talent directly."[79] According to an SIA Webinar, 26% of the companies who use contingent labor in 2020 employ direct sourcing and an additional 41% are looking to implement direct sourcing in the next two years.

---

[79] Stenger Dec. ¶ 14 and Ex. B to Stenger Dec.

In short, Thomson's decision to use TalentNet was in Thomson's best interests and the transition to direct sourcing increased Thomson's profitability and productivity.[80] When Khublall left Thomson in December 2018, a year after Thomson investigated Pride's contentions, Thomson paid Khublall severance and, subsequently, a bonus while inviting him to seek other Thomson employment.[81] In 2018, Khublall's gross compensation from Thomson was $240,198, just shy of the $250,000 annual salary that Pride alleges Khublall sought from Pride.[82]

## H.    Pride Has Spoliated Evidence It Cited When Accusing Khublall

On July 26, 2017, over a month before Goodall interviewed Russell and Russell asserted having recordings of Khublall,[83] Russell and Pride threated to sue Khublall and Thomson in writing.[84] On December 21, 2018, Pride sent Khublall, TalentNet, and Thomson a formal "Notice of Intent to Sue . . . Litigation Hold Notice"[85] and on December 2, 2019, Pride sent Thomson another Litigation Hold Notice.[86] In Pride's May 13, 2020 Amended Responses and Objections to Khublall's Notice to Admit, Pride admits not having preserved the recordings of Khublall.[87]

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

As stated by the United States Supreme Court, where the moving party has carried its burden under Fed. R. Civ. P. 56(c), "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "In the language of the Rule, the non-moving party must come

---

[80] Tobiasen Dec. ¶ 23; Passaquin Dec. ¶ 29.
[81] Moll Dec. ¶ 7.
[82] Moll Dec. ¶ 8.
[83] Goodall Dec. ¶ 14.
[84] Ex. 20, July 26-27, 2017 email chain.
[85] Ex. 26, Pride's December 21, 2018 Litigation Hold Notice.
[86] Ex. 27, Pride's December 2, 2019 Litigation Hold Notice.
[87] Ex. 28, Excerpt from Pride's May 13, 2020 Amended Responses and Objections to Khublall's Notice to Admit.

forward with "specific facts showing that there is a *genuine issue for trial. Id.* at 587 (emphasis in original). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue of fact for trial.'" *Id.*

## II.   PRIDE'S TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS CLAIM SHOULD BE DISMISSED

In the FAC's single cause of action for tortious interference with business relations, Pride alleges that, despite having no contract with Thomson, it "had an existing business relationship with Thomson" and that Khublall as the Thomson-Pride "relationship manager," "intentionally and knowingly interfered with this business relationship by improperly causing Thomson to terminate Pride One as its Payroll Services provider." (FAC at ¶¶ 30-32) Pride alleges Khublall acted "maliciously and for the sole purpose of harming Pride" or, alternatively, "through dishonest, unfair, unlawful and/or improper means . . . by causing Thomson to terminate its business relationship with Pride One in breach of the fiduciary duty Defendant owed to Thomson as its employee." (FAC at ¶¶ 33-34)

Pride cannot prove the required elements for its claim, which are: (1) Pride had business relations with a third party; (2) Khublall interfered with those business relations; (3) Khublall acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) Khublall's acts injured the relationship. *16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (citing *Raedle v. Credit Swiss Agricole Indosuez,* 670 F.3d 411, 417 (2d Cir. 2012)). Pride's cause of action has a limited scope. Courts require "proof of more culpable conduct on the part of the interferer" to impose liability if there is not an existing contract. *White Plains Coat & Apron Co., v. Cintas Corp.*, 8 N.Y.3d 422, 425-426 (2007); *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group*, 87 N.Y.2d 614 (1996).

Pride, of course, has no claim against Thomson for Thomson's lawful business decision to transform its business. Further, given Pride's initial resistance and hardened refusal to participate in Thomson's transformation to a direct sourcing business model, utilizing new technology, Thomson's decision was more than merely rational. When Pride attacked Thomson's employee, Khublall, for Thomson's decision, Khublall's bosses at Thomson decided not to have Pride provide payroll services under Thomson's new business model. None of this gives rise to a viable claim against Khublall.

A.   **Thomson Is Not a Third Party Distinct From Khublall**

Under New York law, a tortious interference claim not based upon an existing contract requires that a defendant direct activity at a third party and convince the third party not to do business with the plaintiff. *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995). Thomson is <u>not</u> a third party because Khublall was a Thomson employee. Thomson consistently and to this day applauds Khublall. As Khublall was an agent for a disclosed principal and Pride has no claim against Thomson, Pride also has no claim against Khublall for its alleged loss of derivative business arising out of Pontoon's contract with Thomson.

New York law recognizes an "essential distinction between a corporation and those individuals who administer its affairs, and that sound public policy restricts the imposition of liability on corporate officers and directors for the acts of the corporation." *Petkanas v. Kooyman*, 303 A.D.2d 303, 305 (1st Dep't 2003). With less authority and autonomy than corporate officers, Pride's suggestion that Khublall should be liable for his employer's lawful business decision is worse than aberrational. Even in the context of a claim for tortious interference with contract (for which there is a much lower standard of proof than Pride's claim), an agent cannot be held liable for inducing his principal to breach a contract when acting within the scope of the agent's authority. *Devash LLC v. German Am. Capital Corp.*, 104 A.D.3d 71, 79

(1st Dep't 2013); *Nu-Life Constr. Corp. v. Bd. of Educ. of the City of New York*, 204 A.D.2d 106, 107 (1st Dep't 1994).

Thomson authorized Khublall's work, directed it, approved it, and even today ratifies it. Pride must show conduct that was beyond the scope of Khublall's employment or "motivated by personal gain." *Petkanas*, 303 A.D.2d at 305. It has no evidence to challenge the Thomson chorus of approval of Khublall. In *Petkanas*, the First Department explained that "motivated by personal gain" means that the agent acted "with malice . . . calculated to impair the plaintiff's business for [personal profit]." *Id.* (internal citations omitted). According to Thomson, Thomson's transformation strategy and its business decision to implement direct sourcing benefitted Thomson. Pride cannot contradict this and "[t]hese rules are consistent with the principle that a defendant cannot tortiously interfere with a contract if he is not a 'third party unrelated to the contract.'" *Burdett Radiology Consultants, P.C. v. Samaritan Hosp.*, 158 A.D.2d 132, 136 (3d Dep't 1990).

Khublall's alleged solicitation of a bribe from Pride and claimed retaliation also cannot form the basis of a tortious interference with business relations claim because, as alleged, it was directed to Pride, not a third party. *Carvel v. Noonan*, 3 N.Y.3d 182, 193 (2004) ("[Interfering] conduct must be 'directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.'"); *accord*, *RXR WWP Owner LLC v. WWP Sponsor, LLC*, 132 A.D.3d 467, 469 (1st Dep't 2015); *Havana Cent. NY2 LLC v. Lunney's Pub, Inc.*, 49 A.D.3d 70, 74 (1st Dep't 2007). Relying on the New York Court of Appeals seminal *Carvel Corp. v. Noonan* decision, in *Gun Hill Rd. Serv. Station v. ExxonMobil Oil Corp*, 08 Civ. 7956 (PKC), 2013 WL 395096, at *50 (S.D.N.Y. Feb. 1, 2013), a factually similar case, the court explained that plaintiff's tortious interference claim fails because "the only potential criminal or tortious

conduct, an alleged kick-back scheme, was not directed at the third party, with whom the plaintiff had the business relationship." *Id.*

Pride knows this and the FAC does not allege that the claimed bribe solicitation constitutes tortious interference. Instead, Pride's argument is that Khublall breached his fiduciary duty to Thomson by soliciting a bribe, but that too is not tortious interference. (*See infra* at points C and D)

### B.   Khublall Did Not Act For the *Sole* Purpose of Harming Pride

Pride's pleaded cause of action requires Pride to demonstrate "defendant's wrongful conduct." *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 107 (2d Cir. 2009). Pride's first alternative allegation reaches for the "sole purpose" exception to the wrongful means element of its tortious interference claim:

> [T]he "wrongful means" element sets a high bar. Unlike a claim for tortious interference with contract, which requires a plaintiff to show no more than that the defendant intentionally and without justification procured a breach of a valid contract of which he was aware, a claim for tortious interference with business relations requires a plaintiff to show, "as a general rule," that "the defendant's conduct . . . amount[ed] to a crime or an independent tort," *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 . . . (2004). New York courts have recognized an exception to this rule "where a defendant engages in conduct 'for the sole purpose of inflicting intentional harm on plaintiffs.'" *Id.* (quoting *NBT Bancorp, Inc. v. Fleet/Norstar Fin. Grp., Inc.*, 215 A.D.2d 990, 990 . . . (3d Dep't 1995), *aff'd*, 87 N.Y.2d 614 . . . (1996)). But this exception is narrow: When a defendant has acted with a permissible purpose, such as "normal economic self-interest," wrongful means have not been shown, even if the defendant was "indifferent to the [plaintiff's] fate." *Id.*

*16 Casa Duse, LLC v. Merkin*, 791 F.3d 247, 262 (2d Cir. 2015) (internal citation omitted). Further, New York recognizes that the privilege to select those with whom one does business "exists regardless of the actor's motive for refusing to enter business relations with the other." *Turner Constr. Co. v. Seaboard Surety Co.*, 98 A.D.2d 88, 90-91 (1st Dep't 1983) (quoting Restatement, Torts § 762 Comment c). In *Turner,* the Court stated:

> It is well-settled law of this State that the refusal to maintain trade relations with any individual is an inherent right which every person may exercise lawfully, for reasons he deems sufficient or for no reason whatever, and it is immaterial whether such refusal is based upon reason or is the result of mere caprice, prejudice or malice.

*Id.* at 90 (quoting *Locker v. Am. Tobacco Co.*, 121 A.D. 443, 451-152 (2d Dep't 1907), *aff'd*, 195 N.Y. 565 (1909)); *see*, *House of Materials v. Simplicity Patterns Co.*, 298 F.2d 867, 872 (2d Cir. 1962) ("[I]t generally has been held that 'fundamental assumptions in free enterprise' including the belief that 'each business enterprise must be free to select its business relations in its own interest' may justify or excuse the act of one who causes harm to another as a collateral consequence of his refusal to continue a business relationship terminable at will.").

Thomson refutes the allegation that Khublall acted wrongfully as its employee. Thomson provides evidence that Khublall did his job as required and approved, and that Khublall's actions were in Thomson's interests. This negates any possibility that Khublall's "sole motivation" was to inflict intentional harm on Pride. *Snyder v. Sony Music Entm't, Inc.*, 252 A.D.2d 294, 300 (1st Dep't 1999) (affidavits submitted by defendants "provid[ed] legitimate, nontortious reasons" for actions at issue such that "no triable issue of fact exists as to whether defendants' sole motivation was to harm [plaintiff]"). There is no evidence of any Khublall malice. Instead, there is overwhelming evidence that Khublall acted to implement Thomson's transformation objective and that Thomson credits Khuball with success.[88]

### C.    Khublall's Alleged Breach of Fiduciary Duty to Thomson Cannot Form the Basis for a Tortious Interference Claim

Pride's allegation of a bribe solicitation from Pride is immaterial as a matter of law. Pride's claim that Khublall breached a fiduciary duty owed to Thomson cannot be the basis of

---

[88] Pride may attack Khublall arguing that Thomson let him go in a reduction in force. Nonetheless, Thomson paid Khublall his 2018 bonus, severance, and obviously disagrees with Pride's contentions. Moll Dec. ¶ 7.

Pride's tortious interference claim. First, Pride lacks standing to allege such a breach.[89] *See Castellotti v. Free*, 138 A.D.3d 198, 210 (1st Dep't 2016) ("Even if a fiduciary relationship did exist, the claims that [defendant] misappropriated [the company's] funds and failed to operate the company in compliance with the law belong to the company not [plaintiff]."); *Seretis v. Fashion Vault Corp.*, 110 A.D.3d 547 (1st Dep't 2013) (dismissing breach of fiduciary duty claims because the allegations "plead a wrong to the corporation only, for which the shareholder may sue derivatively but not individually"); *Marmelstein v. Kelhillat New Hempstead: Rav Aron Jofen Community Synagogue*, 45 A.D.3d 33, 36 (1st Dep't 2007), *aff'd*, 11 N.Y.3d 15 (2007) ("[T]o maintain a cause of action for breach of fiduciary duty, the existence of a duty [to the party asserting the breach] is essential.").

Second, to satisfy the "wrongful means" element of a tortious interference with business relations claim, the defendant must have owed (and breached) a fiduciary duty to the plaintiff, not the party with whom plaintiff had a business relationship. *Compare Etkin & Co. v. Patrusky*, 235 A.D.2d 300, 301 (1st Dep't 1997) (tortious interference with prospective business relationship claim dismissed because "[t]he alleged breach of fiduciary duty by defendants does not relate to any duty they owed to plaintiff, and thus cannot support a claim of wrongful means"); *with Don Buchwald & Assocs. v. Marber-Rich*, 11 A.D.3d 277, 278-79 (1st Dep't 2004) (reinstating tortious interference claim where defendants allegedly breached their fiduciary duties to plaintiff); *and American Baptist Churches v. Galloway*, 271 A.D.2d 92, 100 (1st Dep't 2000) (same). Here, Khublall did not owe Pride a fiduciary duty.

---

[89] In construing New York common law, federal district courts are in accord. *See, e.g.*, *Bank of Am. Corp. v. Braga Lemgruber*, 385 F. Supp.2d 200, 224 (S.D.N.Y. 2005) ("A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority, and any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively on its behalf.") (dismissing breach of fiduciary claims for lack of standing).

### D.    Khublall Did Not Breach a Fiduciary Duty to Thomson

Even if a Khublall breach of fiduciary duty owed to Thomson could satisfy the wrongful means element, which it cannot, Pride would still have to show that Khublall actually breached his fiduciary duty to Thomson. Under New York law, a claim for breach of the duty of loyalty requires the plaintiff to show "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." *Swabath Info Servs. Co. v. Eagle*, 598 Fed. Appx. 794, 795 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)); *see also Stortini v. Pollis*, 138 A.D.3d 977, 978-979 (2d Dep't 2016); *Fitzpatrick House III, LLC v Neighborhood Youth and Family Servs.*, 55 A.D.3d 664, 664 (2d Dep't 2008). Given Thomson's praise of Khublall, there is no evidence of damage to Thomson by Khublall.

### E.    Khublall's Actions Were Not the Proximate Cause of Any Injury to Pride's Business Relationship with Thomson

As the FAC acknowledges, Pride "must demonstrate *both* wrongful means *and* that the wrongful acts were the *proximate cause* of the rejection of the plaintiff's proposed contractual relations." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171- 72 (2d Cir. 2004) (emphasis in original) (quoting *Pacheo v. United Med. Assocs., P.C.*, 305 A.D.2d 711, 712 (3rd Dep't 2003)); *see also Valley Lane Indus. Co. v. Victoria's Secret Direct Brand Mgmt, L.L.C.*, 455 Fed. Appx. 102, 107 (2d Cir. 2012). There must be a "direct nexus" between Khublall's actions and the claimed injury. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115 (2d Cir. 2008) ("[T]he defendant's wrongful conduct against third-parties bore a *direct nexus* to the relationship with which the defendant interfered.") (emphasis added).

Pride cannot show that "but for" Khublall's actions its business relationship with Thomson would not have changed. *First*, Pride caused the demise of its claimed derivative income stream by refusing to adapt to a transforming Thomson. On June 1, 2016, after Khublall

introduced TalentNet and Pride, senior Pride management memorialized their hostility to TalentNet and their fear that TalentNet threatened Pride's business. Subsequently, on October 3, 2017, after being given repeated audiences with Thomson, Pride's Russel wrote to Thomson: "We are not interested in contracting with TalentNet or any competitive third party." *Second*, Thomson's repeated authorization, ratification, and condonation of the direct-source strategy to transform Thomson's contingent labor practices severs the causal connection between Khublall's actions and Pride's alleged loss.

## III.   <u>PRIDE'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE DISMISSED</u>

Where punitive damages are sought in a tort action, the tort must be so egregious as to be characterized as "gross" and "morally reprehensible" and of such "wanton dishonesty as to imply a criminal indifference to civil obligations." *New York Univ. v. Cont'l Ins. Co.*, 8 N.Y.3d 308, 314 (1995) (citing *Walker v. Sheldon,* 10 N.Y.2d 401, 406 (1961)). Khublall should be awarded summary judgment dismissing Pride's punitive damages claim because Pride has not (and cannot) demonstrate the necessary malice, moral turpitude, or wanton dishonesty, such as willful fraud, that warrants the imposition of exemplary damages. *Kruglove v. Copart of Conn., Inc.*, 771 Fed Appx. 117, 120 (2d Cir. 2019), *Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 225 (2d Cir. 2017). Instead, the evidence demonstrates is that Khublall did his job well, with Thomson approval.

<u>CONCLUSION</u>

This is a baseless litigation by a disgruntled downstream vendor lashing out maliciously at a vulnerable target and trying to injure him by litigation. For all the foregoing reasons, Khublall should be awarded summary judgment dismissing Pride's First Amended Complaint.

Dated:  New York, New York
       November 6, 2020

Respectfully submitted,

WECHSLER & COHEN, LLP

By: */s/ Mitchell S. Cohen*      
     David B. Wechsler
     Mitchell S. Cohen
     Debora A. Pitman
     Daniel B. Grossman
*Attorneys for Defendant*
17 State Street, 7th Floor
New York, New York 10004
(212) 847-7900
dwechsler@wechco.com
mcohen@wechco.com
dpitman@wechco.com
dgrossman@wechco.com

Jonathan Harris, Esq.
HARRIS ST. LAURENT LLP
*Attorneys for Defendant*
40 Wall Street, 53rd Floor
New York, New York 10005
(646) 395-3481
jon@hs-law.com