UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                        :
PRIDE TECHNOLOGIES, LLC D/B/A PRIDE  :
ONE,                                       :
                                        :      19 Civ. 11315 (LGS)
                        Plaintiff,  :
                                        :      **OPINION AND ORDER**
              -against-              :
                                        :
DANIEL KHUBLALL,                  :
                                        :
                      Defendant.  :
-------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Pride Technologies, LLC d/b/a Pride One ("Pride"), a payroll services provider, brings this action against Defendant Daniel Khublall ("Khublall"), a former employee of Thomson Reuters Corporation ("Thomson"), for tortiously interfering with Pride's business relationship with Thomson. Khublall moves for summary judgment. For the reasons stated below, Khublall's motion is granted.

**I.      BACKGROUND**

       The following facts are drawn from the parties' submissions, including their Local Civil Rule 56.1 statements, and are undisputed unless otherwise noted.

       **A.      Improving Efficiencies at Thomson**

       Between 2013 and 2017, Pride served as a payroll services provider for Thomson. This relationship was formed through Pontoon Solutions, Inc. ("Pontoon"), a managed service provider ("MSP"), which retains vendors like Pride to provide various services in connection with the administration and management of end users' temporary staffing needs. Here, Thomson, the end-user, selected Pride. Pontoon contracted with Pride to provide payroll

services to Thomson.  Pride and Thomson did not have a contractual relationship, and Pride was paid through Pontoon.

In 2016, Thomson sought to improve its operational efficiency.  Thomson created the Enterprise Technology & Operations ("ET&O") group to determine where key savings could be achieved by improving efficiencies, re-negotiating current contracts and implementing new technologies.  Thomson also retained McKinsey & Company ("McKinsey") to identify areas where Thomson could achieve greater efficiency.  McKinsey identified practices for hiring contingent labor, which consists of temporary workers -- including Pride One workers -- who provide services to Thomson but are not on Thomson's payroll.  Thomson's "Professional Sourcing" department manages these workers.

In response to McKinsey's findings, Thomson's senior management requested an analysis of Professional Sourcing practices and directed that the company investigate alternative services.  Specifically, the company sought to transition its contingent labor to a direct source model through which Thomson could build its own pool of contingent labor personnel and avoid third-party vendor fees.  Khublall assisted with this project.  In April 2016, Thomson launched a direct sourcing pilot program and left the current contingent labor program in place.  The pilot program demonstrated a significant reduction in costs.  Thomson's senior management responded enthusiastically, and in a February 14, 2017, email, Carl Tobiasen, Senior Vice President and Global Head of Sourcing, directed Khublall and Nicolas Passaquin, Senior Director of Strategic Sourcing, to put together a direct source model for review.  On February 28, 2017, Khublall met with Rick King, Managing Director of Operations, to discuss direct sourcing and, in a March 3, 2017, email to Tobiasen, King wrote: "Love what [Khublall] is working on.  Green light."  On March 24, 2017, Khublall recommended TalentNet, Inc. ("TalentNet") to

identify suitable candidates from the Thomson talent pool. TalentNet has proprietary software that utilizes artificial intelligence to analyze candidate information and identify individuals for particular positions. In addition, on June 19, 2017, Khublall proposed that Randstad Professionals US, LLC ("Randstad") serve as Thomson's new MSP because Randstad was well situated to support Thomson's transition to direct sourcing at a competitive price.

In June 2017, Khublall issued an informal request for proposals ("RFP") to parties including Pride and sought innovative ideas to move Thomson's direct source initiative forward. On June 7, 2017, Khublall followed up by providing a worksheet for the parties to complete. Pride provided a proposal focusing on payroll services.

      B.        **Interactions Between Khublall and Pride One**

Pride contends and Khublall disputes that, in April or May 2016, Khublall approached Leo Russell, owner and CEO of Pride, with a plan by which Pride would invest in TalentNet, Khublall would build up revenue in TalentNet by directing Thomson's business to TalentNet, at higher than market prices, and Pride would then hire Khublall at a rate higher than his current salary. Pride contends that Khublall threatened to cause Thomson to terminate its relationship with Pride if Pride would not participate in the alleged scheme (the "Alleged Threat"). On June 30, 2017, Russell sent an email to Lisa Moyer, Head of Talent Acquisition at Thomson, requesting an audience to discuss the Alleged Threat. In addition, on July 6, 2017, Russell spoke with Passaquin on the phone about the Alleged Threat and on July 26, 2017, he sent an email to Passaquin, copying Tobiasen, in which he described the Alleged Threat and complained of Khublall's violation of Thomson's code of conduct. Passaquin and Tobiasen expressed that they believed there was nothing wrong with Khublall's behavior. A responsive email from Passaquin to Russell states:

> I am not sure that there is anything new in what you wrote below compared to the conversation we had early July.  Following that conversation, I talked to multiple people internally and externally and did not find anything which would raise a suspicion apart from your words [].  The procurement strategy that [Khublall] is implementing has been documented, presented, explained and approved by our senior executives.  We will go ahead as planned as it gives scale, cost effectiveness and a consistent global model for Thomson Reuters.

Passaquin directed Khublall to move forward with the direct sourcing plan and stated that Thomson was "resolved" because Pride could not offer "a global and scalable solution" for direct sourcing.

In response to Russell's complaints, Robert Goodall, Thomson's Head of Corporate Compliance and Audit, investigated Khublall's behavior.  The investigation consisted of capture and review of Khublall's documents and communications, interview of Khublall, interview of Russell and discussions with Passaquin, Tobiasen and John DeMattia, Khublall's former supervisor.  Based on his investigation, Goodall concluded that "Mr. Russell presented no information to support any of the allegations he raised concerning Mr. Khublall," and that Khublall both "denied having an undisclosed conflict of interest with TalentNet," and "presented extensive internal documentation and emails supporting Sourcing's transformation strategy for reducing contingent labor costs."  The relevant Enterprise Compliance Investigation report states that "the decision by Thomson Reuters management to engage TalentNet as part of the Sourcing transformation strategy is a business decision."

### C. Khublall's Promotion of TalentNet

Russell's July 26, 2017, email to Passaquin describing the Alleged Threat, also asserts that Khublall "took it upon himself to evangelize TalentNet to the industry" and solicited corporate clients on behalf of TalentNet.  Pride contends that in 2015 -- before Pride's initiative to improve efficiency by transitioning to direct sourcing -- Khublall began taking steps to ensure

TalentNet's future at Thomson. In addition, Plaintiff contends that Khublall promoted and sold TalentNet's services to third parties, including CitiBank, Nike, Cisco, eBay and Western Union.

D. **Transition to Direct Sourcing**

Khublall did not have authority to terminate or enter into contracts on behalf of Thomson[1] and needed approval from Thomson's finance, sourcing, legal and human resources departments before the company could implement a direct sourcing model. Senior management ultimately provided the necessary approvals. Thomson did not begin the transition to TalentNet and Randstad until after Russell raised his concerns about Khublall. This transition increased profitability and productivity.

Effective from December 17, 2018, Khublall was terminated from Thomson in connection with a reduction in workforce. He was paid twenty-six weeks' severance and through his separation agreement, was encouraged to apply for future employment at Thomson.

II. **APPLICABLE LAW**

A. **Summary Judgment**

Summary judgment is appropriate where the record establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is a genuine dispute of material fact "if the evidence is such that a

---

[1] Pride disputes this fact based on Khublall's representation that he was "the person in charge of the program." However, Khublall's superiors have provided declarations asserting that Khublall did not have the authority to terminate or enter into contracts on behalf of Thomson. Any argument that Khublall had apparent authority to terminate or enter into contracts on behalf of Thomson would fail as such a theory is based on "the written or spoken words or any other conduct *of the principal* which, reasonably interpreted, causes a third person to believe that the principal consents to have an act done on his behalf by the person purporting to act for him." *See FAT Brands Inc. v. PPMT Cap. Advisors*, Ltd., No. 19 Civ. 10497, 2021 WL 37709, at *6 (S.D.N.Y. Jan. 5, 2021) (applying New York law) (emphasis added). Here there were no such representations by Thomson.

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113 (2d Cir. 2017). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "constru[e] the evidence in the light most favorable to the nonmoving party and draw[] all reasonable inferences and resolv[e] all ambiguities in its favor." *Wagner v. Chiari & Ilecki, LLP*, 973 F.3d 154, 164 (2d Cir. 2020) (internal quotation marks omitted). "When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Fed. Trade Comm'n v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019) (quotation marks omitted).

### B. Tortious Interference with Business Relations

Under New York law,[2] "[t]o prevail on a claim for tortious interference with business relations, a party must prove: (1) that it had a business relationship with a third party; (2) that the defendant knew of that relationship and intentionally interfered with it; (3) that the defendant acted solely out of malice or used improper or illegal means that amounted to a crime or independent tort; and (4) that the defendant's interference caused injury to the relationship with

---

[2] As the parties rely on New York law, the Court applies New York law. *See Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("The parties' briefs assume that New York law controls, and such implied consent ... is sufficient to establish choice of law." (internal quotation marks and citations omitted)).

the third party." *Stuart's, LLC v. Edelman*, No. 12560/09, 2021 WL 3177782, at *2 (App. Div. 2d Dep't July 28, 2021) (quoting. *106 N. Broadway, LLC v. Lawrence*, 137 N.Y.S.3d 148, 157-58 (2d Dep't 2020)). "[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship." *Carvel Corp. v. Noonan*, 818 N.E.2d 1100, 1105 (N.Y. 2004); *accord 106 N. Broadway, LLC*, 137 N.Y.S.3d at 157. The conduct directed at the third-party must "amount to a crime or an independent tort, or some 'wrongful means,' or the defendant must have acted 'solely out of malice.'" *Stuart's, LLC*, 2021 WL 3177782, at *2; *106 N. Broadway*, 137 N.Y.S.3d at 158. "'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure; they do not, however, include persuasion alone although it is knowingly directed at interference with the contract." *Carvel*, 818 N.E.2d at 1104 (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 449 (N.Y. 1980)); *accord Stuart's, LLC*, 2021 WL 3177782, at *2.

Generally, an employee acting within the scope of his authority as an agent of his employer cannot be held liable for tortious interference with one of the employer's business relationships. *See Vendetti v. Zywiak*, 140 N.Y.S.3d 635, 638, *re-argument denied*, 143 N.Y.S.3d 249 (4th Dep't), *appeal dismissed*, 169 N.E.3d 1236 (N.Y. 2021) (relying on this principle to affirm a jury finding on a claim for tortious interference with contract). To establish a[n employee's] liability for inducing interference with his employer's business relations, the plaintiff must show that:

> [t]he acts of the [employee] which resulted in the tortious inference . . . either were beyond the scope of their employment or, if not, were motivated by their personal gain, as distinguished from gain for the corporation. . . [P]ersonal gain [has been construed to mean] that the challenged acts were undertaken with

7

> malice and were calculated to impair the plaintiff's business for the personal profit of the [individual] defendant."

*Petkanas v. Kooyman*, 759 N.Y.S.2d 1, 2 (1st Dep't 2003) (internal quotation marks omitted) (based on this principle, dismissing a complaint alleging tortious interference with contract); *accord C.H.A. Design Exp. (H.K.) Ltd. v. Miller*, 142 N.Y.S.3d 18, 20 (1st Dep't 2021).

### III.  DISCUSSION

Summary judgment is granted on Pride's single cause of action for tortious interference because, even assuming that Khublall acted tortiously toward Thomson, his conduct did not interfere with Pride's relationship with Thomson -- i.e., his conduct did not *cause* Thomson to terminate its business relationship with Pride. *See Stuart's, LLC*, 2021 WL 3177782, at *2 (explaining "that the defendant's interference [must have] caused injury to the relationship with the third party").

Pride has advanced several theories of Khublall's wrongful conduct to support its tortious interference claim, including the Alleged Threat. The threat was made to Pride allegedly to coerce Pride into investing in TalentNet and hiring Khublall. As a threshold matter, the Alleged Threat cannot support the tortious interference claim in this case because it was not directed at Thomson, the third-party with whom Plaintiff had a business relationship. *See, e.g, 106 N. Broadway, LLC* 137 N.Y.S. 3d at 158 (dismissing a tortious interference with contract and tortious interference with prospective business relations claim where the alleged wrongful conduct was not directed at the party to whom the plaintiff sought to sell property, but instead was directed at third parties for the alleged purpose of thwarting the sale); *Arnon Ltd v. Beierwaltes*, 3 N.Y.S.3d 31, 33 (1st Dep't 2015) (affirming dismissal of counterclaim for tortious interference with prospective economic relations where the wrongful conduct, an allegedly frivolous lawsuit, was not directed at the counterclaim-plaintiff's customers to cause them to

terminate business relations with counterclaim-defendants, but instead was directed at the counterclaim-plaintiff to prevent it from selling to prospective customers); *Gun Hill Rd. Serv. Station v. ExxonMobil Oil Corp.*, No. 8 Civ. 7956, 2013 WL 395096, at *16 (S.D.N.Y. Feb. 1, 2013) (dismissing claim for tortious interference with prospective business relations under New York law where the only potential criminal or tortious conduct, an alleged kick-back scheme, was directed at a plaintiff and not the third party with whom the plaintiffs had a business relationship).

Conduct that was directed at Thomson -- including Khublall's assistance with the direct sourcing pilot program, solicitation of RFPs in support of the direct sourcing initiative, presentations to Thomson management on a proposed direct sourcing model and recommendations that Thomson use TalentNet and Randstadt -- cannot support a tortious interference claim. This conduct was within Khublall's scope of employment as he was tasked with assisting Thomson in its transition to a direct sourcing model to increase efficiency. Khublall's actions aided this direct sourcing initiative. Conduct within the scope of Khublall's employment cannot be the basis for a tortious interference claim. *See Vendetti*, 140 N.Y.S.3d at 638. In addition, this conduct was not independently criminal or tortious such that it could support a tortious interference with business claim. *See Stuart's, LLC*, 2021 WL 3177782, at *2

Pride advances two additional theories of wrongful conduct: (1) that Khublall breached his duty of loyalty to Thomson by secretly directing or planning to direct Thomson's business to TalentNet without a bidding process and at higher than market prices and (2) that Khublall interfered in Pride's business relationship with Thomson solely out of malice in retaliation for Pride's refusal to participate in Khublall's alleged scheme. However, any factual disputes

9

regarding these theories are immaterial as the undisputed evidence shows that this conduct did not *cause* Thomson to terminate its relationship with Pride.

The record shows that Russell made Thomson aware of Khublall's Alleged Threat and promotion of TalentNet before Thomson elected to end its relationship with Pride. Even with this knowledge, Khublall's superiors decided that Pride, which focuses on payroll services, could not provide "a consistent global and scalable solution" for direct sourcing. This is supported by Thomson's internal investigation into Khublall's conduct, which concluded, in part, that "the decision by Thomson Reuters management to engage TalentNet as part of the Sourcing transformation strategy is a business decision." This is also supported by Thomson's efforts to improve efficiency, including the company's engagement of McKinsey, identification of practices for hiring contingent labor as an area for improvement, and launch of the direct sourcing pilot program, which demonstrated a significant reduction in costs. In other words, any relationship Khublall had with TalentNet and any secret scheme to build up TalentNet business did not interfere with Pride's relationship with Thomson; Thomson made a business decision, independent of Khublall's actions. Although Plaintiff disputes this conclusion and asserts that during his deposition, Khublall evaded questions about who decided to fire Pride and why, Plaintiff does not provide evidence from which a reasonable jury could conclude that Thomson terminated its relationship with Pride because of Khublall's conduct. *See Moses*, 913 F.3d at 305 ("Conclusory allegations or denials, therefore, are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.").

Similarly, no reasonable jury could find that Khublall acted solely out of malice in the event leading to Thomson's terminating its relationship with Pride. The undisputed evidence shows that Khublall had legitimate, non-tortious reasons for his conduct -- Khublall was tasked

by his employer, Thomson, to help seek and implement a direct sourcing model for the company; Khublall acted in furtherance of that goal; and Pride, which focuses on payroll services, could not provide a "global and scalable solution" for direct sourcing. *See Snyder v. Sony Music Ent. Inc.*, 684 N.Y.S.2d 235, 252 A.D.2d 294, 300 (1st Dep't 1999) (affidavits submitted by defendants "provid[ed] legitimate, nontortious reasons" for actions at issue such that "no triable issue of fact exists as to whether defendants' sole motivation was to harm [plaintiff]"). Drawing all inferences in favor of Pride -- assuming that the Alleged Threat occurred and that Khublall harbored some retaliatory motive toward Pride for rejecting the Alleged Threat -- a reasonable jury could not find that Khublall lacked *any* legitimate motive for his conduct in promoting and pursuing direct sourcing for his employer, Thomson. As a result, the tortious interference claim fails.

## IV.  CONCLUSION

For the reasons stated above, Khublall's motion to summary judgment is GRANTED. The Clerk of Court is respectfully directed to close the motion at docket no. 92 and to close the case.

Dated:  August 17, 2021
New York, New York

LORNA G. SCHOFIELD
**UNITED STATES DISTRICT JUDGE**